# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

MIGUEL ANGEL TORRES,

Petitioner,

v.

RAYMOND MADDEN, et al.,

Respondents.

Case No.: 3:17-cv-0865-JLS-PCL

**REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE RE:**

**PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS**

## I. INTRODUCTION

Petitioner MIGUEL ANGEL TORRES has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. section 2254 challenging his convictions in San Diego Superior Court case no. SCD243940 for lewd and lascivious acts on a child under the age of 14. (Doc. 1.) Torres contends his due process rights were violated by the trial court's admission of prior convictions for similar acts against his former stepdaughters; the trial judge improperly responded to the jury's questions; and trial counsel provided constitutionally ineffective assistance. (*Id.* at 6-26.) He also argues the cumulative effect of all these errors deprived him of a fair trial. (*Id.*)

The Honorable Janis L. Sammartino referred the matter to the undersigned Judge for Report and Recommendation pursuant to 28 U.S.C. section 636(b)(1)(B) and Local Civil Rule 72.1(c)(1)(d). After a thorough review of the petition, answer, state court

record, and state court decisions, the Court recommends **DENYING** relief.

## II. FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also Parle v. Fraley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). Torres has not presented a rebuttal to the facts as described by the state appellate court. Accordingly, the state appellate court's recitation of the lengthy facts appears below:

A. *The People's Case*

The victim is the daughter of Janet G. (mother) and Carlos C., Sr. (father). She was 12 years old at the time of trial in late 2013. Mother and father had four children together (from oldest to youngest): (1) G.C. (the older of the victim's two brothers), (2) K.C. (the victim's sister), (3) C.C., Jr. (the younger of the victim's two brothers), and (4) the victim. Mother and father separated in 2004.

Mother met Torres in 2006. She testified that Torres told her about a month after she met him that he was a registered sex offender. He informed her he had been convicted of an offense involving his two stepdaughters.

Mother and Torres began dating a few months later. In around 2007, about a year and a few months after he met mother in 2006, Torres moved in with her and her four children in a house in Lakeside where they were living. About one and a half years later they moved into an apartment on Home Avenue. In 2010 they moved again to a residence on Craigie Street. Torres and mother married in 2011. During their relationship Torres and mother had a child of their own, M.

*The Lakeside house*

The victim and one of her two brothers – C.C., Jr. – shared one of three bedrooms in the Lakeside house. The victim testified they had bunk beds in that bedroom and they would "switch it around" as to who would have the top bunk and who would have the bottom one. The victim and C.C., Jr. sometimes left their bedroom door open when they slept.

2

The victim testified that when she was about seven or eight years old, Torres began touching her while she was asleep in her bedroom in the Lakeside house. Torres would touch her upper thigh, his hand moving in a circular fashion. She also felt his hands on her stomach, from her waist to her lower chest. When asked whether Torres touched her vaginal area, the victim answered, "Somewhat." The prosecution asked her to describe how close Torres's hand came to her vagina "on a scale of 1 to 10, 10 being on [her] vagina." She replied, "Seven." She did nothing when she felt Torres rubbing her body because she was "scared" of him.

The victim also testified that Torres would come into her room and rub her body about two times per week when she and the family lived in Lakeside. She indicated he would do it early in the morning close to the time she had to get up to go to school. Torres worked early in the morning.

The victim testified she felt "disgusted" when Torres rubbed her legs and body. She indicated this touching was "different." When Torres came in to the room just to wake her up, he would turn on the light and would not touch her; the light would wake her up. Sometimes she would try to stop his touching her by "pushing him away." When she did this, he never said anything, like "I was just trying to wake you up."

*The Home Avenue apartment*

The Home Avenue apartment had two bedrooms. The victim and her sister – K.C. – shared a bedroom and slept in the same bed, and C.C., Jr. slept on the couch.

The victim testified that Torres's touching her happened "once in a while," about twice a month, in the same way in her bedroom at the Home Avenue apartment. She testified that K.C. was never in bed when Torres came into the room and touched her. She did not know where K.C. was during those times.

While the family lived in the Home Avenue apartment, the victim learned that Torres was a registered sex offender. She and a couple of her friends searched for registered sex offenders in their area using an "iPod" application. They learned that Torres had been convicted of a crime involving children under the age of 14 years. When the victim spoke with her mother about it, her mother said it was not true.

//

*The Craigie Street residence*

The Craigie Street house had three bedrooms, and the victim and C.C., Jr. initially shared one of them. They had separate beds, about three feet apart. K.C. moved out of the house in the fall of 2012 to attend college in Berkeley, and the victim then had her own room, but only for a two-week period.

During the time the family lived at the Craigie Street address, Torres worked for a trucking delivery company. He would wake up between 4:00 and 5:00 a.m. and start work at 5:00 or 6:00 a.m. Mother would wake up the children at 6:20 a.m., after Torres left for work, to get them ready for school.

The lock on the victim and C.C., Jr.'s bedroom door broke. The victim testified that in order to keep the door closed at night, she and her brother placed a towel or piece of cloth in the door jamb. She testified that to open the bedroom door, someone would need to push on the door, which made a creaking noise that was loud "enough so somebody could hear it."

The victim testified that Torres's touching her continued at the Craigie Street house both before and after the lock broke. The touchings happened in the same way and increased in frequency to about three times per week.

*The victim's disclosures to her friends*

The victim testified she did not tell anyone about the touching when they lived in Lakeside or on Home Avenue because she was scared she would be taken away from her family.

In early October 2012, when she was 11, the victim told three friends at her middle school about the touchings: Van, Jasmin, and Carolina. She first disclosed the touchings to Van and Carolina in private Facebook messages. Van and Carolina then told Jasmin. The victim testified she then chatted with all three friends on Facebook about what Torres was doing to her. While chatting with them she would cut herself on the arm with a razor blade and show them pictures of herself cutting her arm.

The victim testified she cut her arm because she "felt so worthless." She would ask herself, "What did I do wrong?" She described holding the blade and "slid[ing] it against [her] skin." She also told her friends that she wanted to die and that she had tried to kill herself. Jasmin testified that the

victim told her she was afraid of her stepdad (Torres) because he might "hurt her again."

The victim further testified that she and her family took a weekend trip to visit K.C. in San Francisco. She testified that during the trip, Van, Jasmin, and Carolina urged her through Facebook to tell the school counselor, Sergio Hernandez, about the touching.

Carolina, who was 12 years of age at the time of the trial, testified she was the victim's friend and classmate. In October 2012 the victim told her that her stepfather had been touching her "in a bad way." The victim also told her she was cutting her wrists and wanted to die. Carolina testified she told the victim to tell her mother about what was happening to her. The victim told Carolina she was "scared" of Torres.

Jasmin, who also was 12 years of age at the time of the trial, testified that the victim told her in October 2012 that her stepfather (Torres) "sexually harassed" her and she was afraid of him. Jasmin also testified that the victim said "she was afraid that he was going to hurt her again." The victim told Jasmin she wanted to die because her life was "messed up already." The victim sent her pictures on Facebook showing the victim cutting her arm. Jasmin testified she told the victim to talk to the school counselor.

Van, who also was 12 years of age at the time of the trial, testified that the victim told her in October 2012 about the victim's stepfather touching her. Van testified she convinced the victim to tell the school counselor about what was happening to her.

*The victim's disclosures on October 16, 2012, to the school counselor and the school police*

On Tuesday, October 16, 2012, the day the victim returned to school, Van took her from their physical education class to the office of the school counselor, Hernandez. The victim talked to Hernandez about what Torres was doing to her, and Hernandez contacted the school's police officer, Officer Carla Kuamoo.

Hernandez testified that the victim appeared "emotionally upset" and "maybe a little bit embarrassed." The victim told him, "I feel like somebody is touching my body at night, my legs, my body." She said she knew her

bedroom door had been opened because a towel she put between the door and door frame would be on the floor in the morning. The victim identified her stepdad as the person who was touching her. The victim told Hernandez, "My stepdad is a registered sex offender." Soon thereafter Hernandez ended the interview and arranged to have Officer Kuamoo come immediately to his office.

While the victim waited outside his office, Hernandez briefed Officer Kuamoo about what he had learned. Officer Kuamoo then walked with the victim to Officer Kuamoo's office. Officer Kuamoo testified that the victim was "very quiet and appeared sad." The victim told Officer Kuamoo that Torres, her stepfather, was touching her all over her body in the nighttime and that it had been happening since she was nine years old. The victim said that she had only told three female sixth grade students at the school before talking with Hernandez.

Officer Kuamoo testified the victim told her she decided to tell Hernandez about the touchings because she "couldn't take it anymore." The victim said she put a towel in the door jamb of her bedroom door every night to try to secure the door because it did not have a lock. She told Officer Kuamoo she would find the towel on the floor in the morning. The victim indicated she sometimes saw Torres come into her room, and he would "speed walk" out of the room if he realized she was awake.

Officer Kuamoo also testified the victim told her Torres last touched her "[a]bout one week ago," and she found out that Torres was a registered sex offender because she looked him up on the registered sex offender Internet website.

*Detective Dickinson's October 16, 2012 recorded interview of the victim, and the victim's recantation letter*

Later that same day, San Diego Police Department Detective Steven Dickinson interviewed the victim in Hernandez's office. The audio recording of the interview was played for the jurors, who were given copies of the transcript of the interview.

During the interview, the victim, who was then 11 years old, told Detective Dickinson that Torres had been touching her. She said Torres thought she did not know about the touching and "he [thought] he [could] get away with it." She told Detective Dickinson that the last time it

3:17-cv-0865-JLS-PCL

happened was about a week earlier when Torres walked into her room and touched her leg while she was sleeping. She said he "stood up and just got out" when she moved her leg. The victim also said Torres would touch her on her thighs, and he would touch her breasts under her pajamas. He had been touching her there about three times a week for about two years. When Detective Dickinson asked her how she knew it was Torres who was touching her, the victim replied, "Cause I woke up and I saw him."

Detective Dickinson scheduled a forensic interview at Rady Children's Hospital for the following day.

The victim testified she was scared to go home after she was interviewed because she knew her mother would not believe her. Her mother came to pick her up from school, and Torres, M., and C.C., Jr. were with her mother in the car. When the car circled the campus a few times and then appeared to be leaving, police officers stopped the vehicle and detained Torres.

A female police officer spoke to mother before letting her take the victim home. When mother was told about the allegations against Torres, she appeared to be upset and denied that anything had happened. The officer informed the mother about the forensic interview of the victim scheduled for the next day and instructed mother not to talk to the victim about the allegations.

The victim testified that mother drove her home. On the way, mother stopped at a store, where she met the victim's two aunts. The victim testified her mother yelled at her and said she lied about the touching. Mother and the victim's aunts told her the touchings were just dreams.

The victim also testified that, when they got home, mother angrily told her that everything that happened was her fault, and it was "only nightmares." Mother told the victim to tell the authorities she was just having nightmares, so that Torres could come home. That night, while mother was watching her, the victim wrote a two-page recantation letter saying she had just been having nightmares. Mother then read the letter. The victim testified she decided to write the letter because "[she] didn't want [her] mom to be mad at [her] anymore."

*First recorded forensic interview of the victim (October 17, 2012)*

//

The next day, Wednesday, October 17, 2012 – just before her forensic interview – the victim gave to Detective Dickinson at the Chadwick Center at Rady's Children's Hospital the recantation letter she had written after her mother told her that what had happened to the victim was not real and was only nightmares.

Laurie Fortin (Fortin), a forensic interviewer at the Chadwick Center, then interviewed the victim. The audio recording of the interview was played for the jurors, who were given copies of the transcript of the interview.

During the interview, the victim told Fortin that a couple of days earlier Torres shook her leg to wake her up because she was having nightmares. She said she had asked the detective if she could get help from the hospital because every day she was "hav[ing] nightmares where [she] feel[s] someone breathing and someone touching [her]." The victim told Fortin she had been having these nightmares since she was eight years old. The victim also said she did not know who was touching her in her nightmares. She told Fortin she only saw her stepdad one time when he woke her up. She also said she wrote the letter she had just given to Detective Dickinson "[be]cause [she] needed help."

The victim also told Fortin that she wrote the letter "last night" when she was alone in her room. The victim said that, before she wrote the letter, she woke up because she felt someone touch her and she ran to the bathroom and then told her mom. Mother told her it was "just [her] imagination." The victim said that "[n]othing" happened in the car the day before when mother drove her home, and she "just stayed quiet" in the car while doing her homework. She told Fortin she was living on Craigie Street, and three times a week she was having the nightmare about somebody breathing and touching her. She said these nightmares started when she was living in Lakeside, but she had them less often then.

Fortin told the victim she had spoken with Detective Dickinson, and he said the victim had told him about her stepdad touching her chest. The victim acknowledged she had "told him about that," and then told Fortin, "[B]ut like now I know it wasn't him."

*Detective Dickinson's second recorded interview of the victim (October 18, 2012)*

//

8

3:17-cv-0865-JLS-PCL

On Thursday, October 18, 2012, the day after the forensic interview at the Chadwick Center, Detective Dickinson again interviewed the victim briefly at her school in Hernandez's office. The audio recording of the interview was played for the jurors, who were given copies of the transcript of the interview.

During the interview, Detective Dickinson told the victim he had learned she was cutting her arm and wanted to know why. The victim told him she was cutting her arm because of "[p]ressure" from "[y]ou guys." Detective Dickinson asked the victim when she cut her arm, and she replied, "Like Friday" (October 12). Detective Dickinson responded, "Okay, but you didn't know me on Friday," and added, "So I couldn't have caused [pressure]." The victim said, "I know," and then told him, "But like, now I have a lot of pressure."

Detective Dickinson testified that he took a photograph during the interview of the 16 cuts on the inner side of the victim's left forearm, then took her into protective custody and had her transported to the Polinsky Children's Center. The victim did not want to go there and became emotional. At the Polinsky Children's Center, Detective Dickinson tried to calm her by telling her she could still attend her same school and the social worker would try to make her routine as normal as possible. Detective Dickinson testified that the victim did not ask to live with mother. He also testified that he told the victim that he and Fortin believed "[her] first story," and the victim replied, "You and my friends are the only ones that believe me." The victim's demeanor then changed and she seemed happy. Detective Dickinson testified "she was completely different" and "she went from frowning to smiling."

*Fortin's second recorded forensic interview of the victim (October 23, 2012)*

Fortin conducted a second forensic interview of the victim on Tuesday, October 23, 2012. A video recording of the interview was played for the jury.

During the interview the victim said she was living at the Polinsky Children's Center. When Fortin asked her, "How is it?," she replied, "Fun." When Fortin told the victim she (the victim) was feeling bad the last time they met because her stepdad had gone to jail and her mother was upset, the victim replied, "The whole world was upset." Fortin asked whether she was still feeling bad, and the victim replied, "No," indicating that the Polinsky

Children's Center had helped her to feel better.

The victim told Fortin that Torres began touching her when she was "like [10]." The last time he touched her was about two weeks earlier. She said he grabbed her leg and "that's when I saw him."

Fortin asked the victim to tell her about the other times Torres touched her. The victim replied, "I would be sleeping, but I'm not dumb." She added that she could "feel everything." She said she would hear the door creaking as it opened. The victim then told Fortin that, when she heard the noise, she "would just, like, open my eyes and when [Torres] saw me open my eyes, he would get out."

When Fortin asked about the touchings, the victim said she "would like act asleep" when Torres was touching her. When she opened her eyes, Torres would "disappear or something," but sometimes she would "see him walking out." Torres touched the victim's "leg muscles," and he also touched her, "in a poking manner, on her stomach."

The victim told Fortin she had told her friend Carolina that she wanted to kill herself. When Fortin asked the victim why she started cutting herself, she replied, "because whenever I thought of it, I thought, I just thought my life was ruined." Fortin asked, "Thought about what?" The victim answered, "You know, about what [Torres] was doing in the night."

*Child Sexual Abuse Accommodation Syndrome Evidence*

In addition to testifying for the prosecution as a percipient witness regarding her observations during her forensic interviews of the victim, Fortin also testified as an expert witness. [Footnote omitted.] She testified that, in the context of child abuse, "'recantation' is believed to be . . . a stage of a child's disclosure process for some kids, a minority of kids." She referenced a study that found three "statistically significant predictors" of recantation among child sexual abuse victims: (1) an offender who is "a parental figure, typically . . . a father figure, mom's boyfriend, stepfather"; (2) "a nonsupportive primary caretaker, which was the moms [*sic*] in 90 percent of the cases"; and (3) the child's age.

Fortin also testified about "delayed disclosure" in the child abuse arena. She told the jury that "the majority of kids actually delay in disclosing abuse." She testified that studies show children do not exhibit any particular

mannerisms or behavior when they disclose sexual abuse. She also discussed literature that suggests older children – ages 10 years "up to teens" – are more likely than younger age children to disclose abuse to their peers. Fortin also testified that a child who has received negative feedback after disclosing abuse might recant but then "reaffirm" the initial disclosure after receiving positive feedback.

*Torres's prior sexual offenses (Pen. Code, § 288 (a))*

The parties stipulated that in February 2002 Torres was charged under Penal Code section 288(a) with 26 counts of committing lewd and lascivious acts on a child under the age of 14 years between 1989 and 1999. Those offenses involved Torres's two stepdaughters from a prior marriage, V. and G.

The parties also stipulated that in May 2002 Torres pleaded guilty to committing three of those counts against V. and three of those counts against G. and that the remaining charges were dismissed.

As discussed more fully, post, V., G., and retired San Diego Police Department Detective James McGhee all testified about Torres's prior Penal Code section 288(a) sexual offenses against V. and G.

*The defense case*

C.C., Jr., the victim's 15-year-old brother, testified for the defense. He testified that his and the victim's older brother, G.C., did not like it when Torres moved in with them, so G.C. went to live with their father.

C.C., Jr. testified that he and the victim had shared a bedroom in the Lakeside house for five or six months. During the rest of that year the victim shared the bedroom with their sister, K.C. C.C., Jr. testified he knew Torres was a sex offender, but during the time he shared the bedroom with the victim he never saw or heard Torres enter the bedroom late at night. He never heard Torres climb into the victim's bed and molest her, and he never woke up and saw Torres running from the bedroom.

C.C., Jr. also testified that he did not share a bedroom with the victim at the Home Avenue apartment, where they lived next for about a year and a half. The victim and K.C. shared a bedroom and slept in the same queen-size bed. While they lived there, C.C., Jr. never heard Torres walking into the

victim and K.C.'s bedroom late at night.

C.C., Jr. further testified that when he and his family moved to the Craigie Street address, where they lived for about a year, he shared a bedroom with the victim and they each slept in one of the bunk beds. The beds were separated after two months and placed about five feet apart. He and the victim used a towel to keep the door shut. Opening the door made a thumping noise. In C.C., Jr.'s opinion, the victim had a reputation for being dishonest.

K.C., the victim's 19-year-old sister, testified that she first met Torres in around 2007 before she and her family moved to the Lakeside house. Before they moved there, mother told her that Torres was a registered sex offender.

K.C. testified that Torres never made any inappropriate comments or gestures toward her during the time they lived in Lakeside. When she and the victim shared a bedroom in the Lakeside house for about six months, they pushed their twin beds together to make more room. The victim always slept by the wall, so someone would have to climb over K.C. to get next to the victim. She never woke up in the middle of the night and noticed Torres climbing over her to get to the victim.

K.C. testified that she shared a bedroom with the victim at the Home Avenue apartment, and they slept in the same queen-size bed in a corner of the room. The victim slept against the wall. She never noticed Torres come into the bedroom in the middle of the night, climb into the bed, and start rubbing and touching her sister. She never woke and noticed Torres in the bedroom.

K.C. also testified she had her own bedroom when they moved to the Craigie Street address. She never heard a thump in the victim and C.C., Jr.'s room. In her opinion, the victim had a reputation for being dishonest.

The father of G.C., K.C., C.C., Jr. and the victim also testified for the defense. In his opinion, the victim had a reputation for being dishonest.

(Lodgment 9 at 6-21)

### III. PROCEDURAL BACKGROUND

On October 19, 2012, the San Diego District Attorney's Office filed an

3:17-cv-0865-JLS-PCL

information charging Torres with four counts of lewd acts inflicted upon a child, a violation of California Penal Code § 288(a). (Lodgment 3 at 14-17.) The information also alleged Torres had suffered six prior serious felony convictions, within the meaning of California Penal Code §§ 667(a), 668 and 1192.7, and six prior "strike" convictions, within the meaning of California Penal Code §§ 667(b) through (i), 1170.12, and 668. (*Id.*) Following a jury trial, Torres was found guilty of all the charges, and admitted he had suffered the prior convictions. (*Id.* at 58.) Torres was sentenced to a term of 300 years-to-life plus twenty years. (*Id.* at 59.)

Torres appealed his conviction to the California Court of Appeal. (Lodgment 5-7.) The state appellate court upheld Torres's convictions for counts two and four, but reversed his convictions for counts one and three due to jury instruction error. (Lodgment 9 at 4.) The state appellate court also modified Torres's sentence to 150 years-to-life plus 10 years. (*Id.*) Torres filed a petition for rehearing in the state appellate court and a petition for review in the California Supreme Court, both of which were denied without citation of authority. (Lodgment 10-13.)

Torres next filed a petition for writ of habeas corpus in the California Superior Court, which was denied in an unpublished opinion. (Lodgment 14-15.) Torres then filed a petition for writ of habeas corpus in the California Court of Appeal, which was denied in a written opinion. (Lodgment 16-17.) Although Respondent states Torres filed a petition for writ of habeas corpus in the California Supreme Court, the lodgment Respondent cites for that assertion does not reflect such a petition was filed by Torres. (*See* Lodgment 18.)[1]

Torres filed a Petition for Writ of Habeas Corpus in this Court on April 27, 2017, and Respondent filed an Answer, Memorandum of Points and Authorities in Support of

---

[1] Lodgment 22 is a copy of a page from the California Courts website which references two cases titled *People v. Torres*. The first, SCD243940, is Torres's case, which ended when Torres's petition for review was denied. (*See* http://appellatecases.courtinfo.ca.gov/search/searchResults.cfm?dist=0&search=party). The second case is also titled *People v. Torres*, but originates from Riverside Superior Court and is not related to the instant case. (*Id.*)

the Answer, and Lodgments on November 16, 2017. (Docs. 1, 15, 15-1–15-2.) Torres filed a Traverse on January 2, 2018. (Doc. 17.)

## IV. STANDARD OF REVIEW

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id*. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The Court may also grant relief if the state court's decision was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (*overruled on other grounds by Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

## V. DISCUSSION

In ground one, Torres argues the trial court erred in admitting evidence of his prior sex crime convictions under California Evidence Code §§ 1108 and 352 because these prior convictions were both irrelevant and highly prejudicial. (Doc. 6-10.) Second, Torres contends the trial court gave a misleading answer to a jury question which permitted the jury to convict Torres based on evidence outside the time period specified in the charging document. (*Id.* at 11-16.) Third, Torres claims his counsel was ineffective in two ways. First, he contends that after counsel was unsuccessful in excluding Torres's prior convictions, counsel failed to have the prior convictions sanitized or redacted to eliminate the more prejudicial details of the crimes. Second, Torres asserts counsel should have moved for a mistrial after a prospective juror made an allegedly incriminating statement. In the presence of other jurors, this juror stated she was a neuroscientist with expertise in "fear, rage and attraction" and she could not be unbiased because she believed people who committed sexual offenses against children were likely to repeat their behavior. (*Id.* at 17-24.) And finally, Torres contends the cumulative effect of all these errors rendered his trial unfair. (*Id.* at 25-26.)

//

### A. Admission of Prior Sexual Offenses

Torres argues in his first ground that the admission of his prior convictions for lewd acts with a child violated his federal due process right to a fair trial because the convictions were irrelevant and inflammatory. (Doc. 1 at 6-10.) Respondent contends the state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Doc. 15-1 at 24-34.) The state appellate court found the past convictions were sufficiently similar to the current convictions so as to warrant admission under California Evidence Code section 1108. (Lodgment 9 at 28.) Additionally, the state appellate court found the prior convictions' probative value was not substantially outweighed by prejudicial impact. (*Id*. at 29-30.)

At trial, the prosecution sought to present testimony from the victims of Torres's past convictions, V. and G. (Lodgment 1 at 8.) Defense counsel acknowledged the prior convictions were presumed admissible under California Evidence Code § 1108,[2] but argued they should be excluded under § 352 because they were more prejudicial than probative. (Lodgment 1 at 8.) The prosecutor argued the convictions were admissible not only under § 1108, but § 1101 as evidence of motive, intent and opportunity. In addition, they were not barred by § 352 because there were significant similarities between the prior convictions and the current crimes. (*Id.* at 10-11.) In both cases, the molestations occurred during the early morning hours in the victims' bedroom while a sibling was sleeping nearby and the sibling did not wake up when the molestations occurred. And in both cases, Torres was alleged to have stroked the victim's legs while they were sleeping. (*Id.* at 9-10.) The trial court concluded the evidence was relevant and admissible under §§ 1108, 1101 and 352. (*Id.* at 11.)

V. testified that Torres began molesting her when she was six years old. (Lodgment 1 at 24-26.) The first time the molestation happened, Torres picked V. up while she was sleeping and carried her to the master bedroom, but on later occasions

---

[2] All citations within this section are to the California Evidence Code unless otherwise noted.

Torres would molest V. while she was in the room she shared with G. and G. was sleeping nearby. (*Id.* at 27-28.) G. never woke up during the molestations. (*Id.* at 30.) The molestations would occur more than twice a week early in the morning while V.'s mother was at work. (*Id.* at 26-28.) Torres would rub V.'s legs and thighs and eventually began undressing her and rubbing his genitalia on her genitalia. (*Id.* at 30.) The molestations stopped when V. began menstruating at age 13. (*Id.* at 31.) Torres told V. that he would harm her mother if she told anyone about the molestations. (*Id.* at 30-31.)

G. testified Torres began molesting her when she was eight years old. (Lodgment 1 at 18.) She and V. shared a room and they slept in bunk beds. (*Id.*) They would switch off sleeping in the top bunk. (*Id.*) The first time Torres molested her, G. was sleeping and woke to find Torres touching her genitals. (*Id.*) Torres later rubbed her legs and breasts. (*Id.* at 20-21.) V. never woke up during these molestations of G. (*Id.* at 23.) Torres told G. to be quiet while the molestations were occurring and, as he had also told V., if G. told anyone about the molestations he would hurt the girls' mother. (*Id.* at 20-21.) The molestations stopped when G. was 15. (*Id.* at 24.)

When V. was 18, she came home from work one day and found her sister G. crying. (*Id.* at 32.) When V. asked her what was wrong, G. told her that Torres had been molesting her. (*Id.*) V. confronted her mother and Torres about the abuse she and G. had suffered, but their mother did not believe them. (*Id.* at 32-33.) V. took G. away and they stayed at a friend's house for two weeks until their mother agreed to call the police and report Torres. (*Id.* at 33.) Torres was later arrested, charged, and convicted. (*Id.* at 34.)

In challenging the more recent convictions, Torres argued in his direct appeals that the evidence of these prior convictions was improperly admitted. (Lodgment 5, 9.) Both of these courts denied the claim, without citing any authority. Torres then raised this claim a final time in a habeas corpus petition filed in the San Diego Superior Court, which is the last reasoned state court decision addressing this claim. That court found the convictions were admissible under § 1101 and § 1108. Similarly, the admission of the convictions did not violate § 352. The habeas court found the convictions highly

probative "for several reasons." Particularly:

> (1) The stepdaughters were around the same age as the victim in the present case when the molestations started. (2) The stepdaughters had recanted their stories, just as the victim did at one point in the present case. (3) The manner and timing of the molestations of the victim and the stepdaughters were very similar. (4) Petitioner presented evidence at trial that the victim had a reputation for being dishonest. (5) Petitioner presented evidence and argument at trial that the circumstances of the victim's sleeping arrangements would have made it virtually impossible for Petitioner to molest the victim without her siblings knowing (the siblings testified that they were never aware of any molestations).

> Each of the above reasons made the evidence of the prior conviction highly probative because they show the similarities between the offenses and they counter the arguments Petitioner made at trial. ([*People v. Falsetta,* Cal. 4th 903,] 911-912 [(1999)].) (1) Tended to prove Petitioner was sexually attracted to young children and showed similarities among the offenses. (2) Tended to prove that Petitioner could have threatened her. (3) Tended to show the similarities between the offenses in both manner and timing (early in the morning). (4) It was critical to the prosecution's case to combat Petitioner's efforts to discredit the victim by providing evidence that she was not the only victim, which tended to support her credibility. (*Id.* at 911.) (5) It was also critical to the prosecution's case to combat Petitioner's efforts to prove Petitioner could not have committed the molestations without making her siblings aware to show that the two stepdaughters had a similar sleeping arrangement, but each of them were not aware that the other was being molested. (*Id.*) The trial court had discretion to rule that any prejudicial effects from admitting the evidence was outweighed by the probative value of such evidence.

(Lodgment 15 at 3-4.)

A state court's erroneous evidentiary ruling cannot form the basis for federal habeas relief unless federal constitutional rights are affected. *Whelchel v. Washington*, 232 F.3d 1197, 1211 (9th Cir. 2000) citing *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir.1987). "While a petitioner for federal habeas relief may not challenge the application of state evidentiary rules, he is entitled to relief if the evidentiary decision created an absence of fundamental fairness that 'fatally infected the trial.'" *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir. 1996) quoting *Kealohapauole v. Shimoda*, 800 F.2d

1463, 1465 (9th Cir.1986). "[A] trial court's ruling does not violate due process unless the evidence is 'of such quality as necessarily prevents a fair trial.'" *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998) (internal citation omitted). Admission of evidence violates due process "[o]nly if there are no permissible inferences the jury may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). If a due process error is found, the Court must then determine if it had a "substantial and injurious effect in determining the jury's verdict." *Brecht*, 507 U.S. at 622.

As Respondent notes, there is no clearly established Supreme Court law which holds that character or "propensity" evidence is inadmissible or violates due process. Indeed, the Supreme Court expressly reserved deciding that issue in *Estelle v. McGuire*, 502 U.S. 62, 75, n.5 (1991). S*ee Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008); *Alberni v. McDaniel*, 458 F.3d 860, 864 (9th Cir. 2006). While a writ should clearly issue when constitutional errors "have rendered the trial fundamentally unfair," the Supreme Court has yet to clearly enunciate a standard by which to determine when, if ever, the admission of "irrelevant or overtly prejudicial evidence" becomes a due process violation, warranting such a writ to be granted. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (citing *Williams v. Taylor*, 529 U.S. 362, 375 (2000), *Carey v. Musladin*, 549 U.S. 70, 77 (2006)).

In fact, Ninth Circuit precedent "squarely forecloses" the claim that admission of propensity evidence violates due process. *Mejia*, 534 F.3d at 1046; *see also, e.g.*, *Greel v. Martel*, No. 10-16847, 2012 WL 907215, 472 Fed. Appx. 503, 504 (9th Cir. 2012)[3] (quoting *Mejia* and applying it to the admission of evidence of sexual misconduct to show propensity). Thus, because there is no clearly established Supreme Court law holding the admission of propensity evidence violates due process, the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly

---

[3] Ninth Circuit Rule 36-3 permits the Court to cite unpublished opinions issued after 2007. (9th Cir. R. 36-3).

established Supreme Court law. *Musladin*, 549 U.S. at 77.

Moreover, there was no error in admitting the evidence under general due process principles. Evidence of Torres's prior convictions for molesting his former stepdaughters was undeniably relevant to the jury's decision as to whether he molested his current stepdaughter. The prior convictions helped establish the necessary intent and motive to convict Torres of the crimes. (*See* Lodgment 3 at 187, 196, 197.) In addition, Torres challenged the credibility of the victim repeatedly. The instruction regarding credibility told the jury one factor they were to consider was "how reasonable is the testimony when you consider all the other evidence in the case?" (*Id.* at 185.) The jury could have considered the prior convictions to evaluate whether the victim was telling the truth about Torres's actions. Thus, there were several permissible inferences the jury could have drawn from this evidence. *Jammal*, 926 F.3d at 920.

For the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254(d); *Yarborough*, 540 U.S. at 4. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Torres's claim to this extent is therefore **DENIED**.

### B. Trial Court's Response to the Jury's Note

In claim two, Torres argues the trial court violated his due process rights by answering a jury note in a manner that permitted the jury to base its verdict on uncharged conduct, thereby lowering the prosecution's burden of proof. (Doc. 1 at 11-16.) Respondent contends the state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Doc. 15-1 at 34-39.) To determine whether this claim is meritorious, the counts themselves and time period of the charges are especially important. Torres was charged with four counts of lewd and lascivious acts: (1) the "first time" leg-touching; (2) "last time" leg-touching; (3) "first time" stomach-touching; and (4) "last time" stomach-touching. All of these incidents were allegedly perpetrated against the victim between January 1, 2011 and October 16,

2012, during which time, the family lived at the Craigie Street residence.

During deliberations, the jury sent out a note containing two questions:

[Question No. 1:] The charges refer to a 'first time' and 'last time.' *If the jury were to agree that one instance happened, wouldn't that also be a 'first time' and 'last time'?*

[Question No. 2:] Defendant is charged with offenses [o]ccurring at Craigie Street, Jan. 1 2011 through Oct. 16, 2012. *Does that [m]ean we are not to consider [e]vents that may or may not have [o]ccurred at the Lakeside and Home Avenue addresses?*

(Lodgment 9 at 45.)

After discussing a response with counsel, the judge answered the jury's questions:

1. Yes. Counts 2 and 4 refer to [e]vents alleged to have occurred at the Craigie Street address.

2. You may consider all the [e]vidence that was admitted at trial.

(*Id*. at 48.)

Torres challenged all four convictions based on the trial court's answers to these questions. Specifically, Torres argued the answer to question one caused erroneous guilty verdicts on counts one and three, while the answer to question two did the same for counts two and four.

On direct appeal, Torres argued the trial court's response to question one could have led the jury to understand one single leg- or stomach-touching incident could simultaneously stand as both a first and a last time offense. (Lodgment 9 at 49.) This understanding could lead to one single lewd and lascivious act being used by the jury to satisfy two counts of lewd and lascivious acts. Additionally, the trial court's response to question two may have led to the jury considering touching incidents before January 1, 2011 as a "first time" touching. The Attorney General conceded this potential misunderstanding warranted a reversal. The state appellate court ultimately ruled the trial court's response to question one "lowered the

prosecution's burden of proof and violated Torres's Sixth Amendment right to a jury trial by directing verdicts on two counts." (*Id*.) The state appellate court accordingly reversed the guilty verdicts on the "first time" stomach-touching and leg-touching counts – counts one and three. The verdicts on counts two and four, the "last time" touchings, were affirmed because the jury was believed to have found at least one leg-touching and one stomach-touching had occurred between January 1, 2011 and October 16, 2012, which would constitute the "last time" charges.

The state appellate court held counts one and three could also be reversed based on the trial court's answer to question two because the jury could have considered the alleged incidents which occurred before January 11, 2011, to be the "first time" touchings. (Lodgment 9 at 55.) However, because the jury was told during both jury instructions and in the trial court's answer to question one that counts two and four must have occurred during the specified timeline, the state appellate court did not agree with Torres that these convictions should be reversed. (*Id*. at 58.)

Now, in his Petition currently before this court, Torres argues the state appellate court's decision was not based on accurate facts. In its answer to question one, the trial court did not state that counts two and four were confined to the January 11, 2011 to October 16, 2013 timeline. Rather, the trial court stated these counts "refer[red] to [e]vents alleged to have occurred at the Craigie Street address." (*Id*. at 48.) As Torres points out, the victim's family moved to the Craigie Street address sometime in 2010, before the January 11, 2011 date. (Lodgment 1 at 201-2, where the victim's mother testified the family lived at the Home Avenue address for most of 2009 and moved to the Craigie Street address in 2010.) Given this discrepancy in the timeline specified in the complaint and the timeline specified by the trial court in answering question one, Torres argues the jury may have used an incident occurring before January 11, 2011, to convict him of the "last time" touchings. (Doc. 1 at 15-16.)

Respondent argues the state appellate court was correct in finding that the

unanimity instruction the jury received was sufficient additional instruction regarding the January 11, 2011 to October 16, 2013 timeline constraints. (Doc. 15-1 at 37.) While Respondent's brief's analysis of the relevant state appellate court decision ends here, the Court finds the second component of the state appellate court's analysis quite important. The state appellate court went on to note there was testimony at trial that when the victim finally reported the touchings to Officer Kuamoo on October 16, 2013, the victim stated the most recent touching had occurred "one week prior." (Lodgment 1 at 171.) This last touching clearly would have then occurred well within the timeframe specified by the complaint.

A state court's instructional error "does not alone raise a ground cognizable in a federal habeas corpus proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988); *see also Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) ("[T]he fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief. Federal habeas courts therefore do not grant relief, as might a state appellate court, simply because the instruction may have been deficient in comparison to the CALJIC model."). Thus, to merit relief, a petitioner must show that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 71-72. Moreover, petitioner is not entitled to habeas relief unless an error in the instructions had a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993); *see also Merolillo v. Yates*, 663 F.3d 444, 455 (9th Cir. 2011) (*Brecht* "substantial and injurious effect" standard governs federal habeas court's review of a state court's harmless error determination); *Frost v. Van Boening*, 692 F.3d 924, 2012 WL 3590853, at *8 (9th Cir. 2012) (same).

The conflicting instructions regarding the dates of the charged acts are clearly confusing; however, these conflicting instructions must have caused a "substantial and injurious effect." *Brecht*, 507 U.S. at 637-38. As the state court noted, there was no prejudice to Torres because overwhelming evidence that Torres had molested the victim

at least once during the time period specified in the information was presented at trial. (*See* Lodgment 3 at 8-11.) The victim testified Torres molested her about three times a week beginning in 2010 and ending shortly before she disclosed the molestations in October of 2012. (Lodgment 1 at 75.) Hernandez, the victim's school counselor, testified the victim told him on October 16, 2012, that Torres had touched her "a couple of days or three days before." (*Id.* at 160.) School police officer Kuamoo testified the victim told her on October 16, 2012 that Torres had last touched her "one week ago." (*Id.* at 176.)  The victim told San Diego Police Officer Dickenson in the October 16, 2012 interview that Torres had touched her the week before and that he had touched her three or four times a week for two years. (Lodgment 3 at 67-70.) She told Fortin, the forensic interviewer, in an October 23, 2012 interview, that Torres had last touched her "two weeks ago." (*Id.* at 129-30.) This evidence is very likely to have led the jury to conclude at least one instance of touching occurred a short time before the victim reported Torres. Accordingly, there was no "substantial and injurious effect" caused by the conflicting instructions because the jury would still have reached the guilty verdict on counts two and four even had the conflicting instructions not been given. *Brecht*, 507 U.S. at 637-38. As such, Torres's claim is **<u>DENIED</u>** to this extent.

### C. Ineffective Assistance of Counsel

In grounds three and four, Torres contends his trial counsel was ineffective in two ways. First, Torres argues that after the trial court denied defense counsel's motion to exclude his prior convictions, counsel should have argued for his prior convictions to be sanitized and for the testimony regarding the prior convictions to be restricted. (Doc. 1 at 17-19.) Second, Torres contends counsel should have moved for a mistrial after a prospective juror allegedly tainted the jury pool by expressing her opinions about sex offenders' recidivism rates. (*Id.* at 20-24.) Respondent counters that the state court's denial of these claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Doc. 15-1 at 39-50.)

To establish ineffective assistance of counsel, a petitioner must first show his

attorney's representation fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. He must also show he was prejudiced by counsel's errors. *Id.* at 694. Prejudice can be demonstrated by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.*; *see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993).

Further, *Strickland* requires "[j]udicial scrutiny of counsel's performance . . . be highly deferential." *Strickland*, 466 U.S. at 689. There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* at 686-87. The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. *Id.* at 697. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citations omitted). As the Supreme Court has stated, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

### *1. Failure to Request that Prior Convictions Be Sanitized*

Prior to trial, defense counsel sought to exclude evidence of Torres's prior molestation convictions, particularly the two victims' testimony. (Lodgment 1 at 8-11.) Defense counsel also sought to exclude Torres's statement to police following his arrest for his molestation of his former stepdaughters. (*Id.* at 35-36, 1-9.) The trial judge concluded this evidence was relevant and admissible under California Evidence Code §§ 1101, 1108 and 352. (*Id.* at 11.) At trial, the victims from Torres's prior convictions, V. and G., testified about what Torres did to them. (*Id.* at 21-34, 15-28.) The detective who interviewed Torres when he was arrested for the crimes leading to his prior convictions, Detective Jim McGhee, also testified about his interaction with Torres. (Lodgment 1 at 29-33.) In addition, the trial judge permitted a tape recording of Torres's interview to be

admitted, but agreed to redact a portion of it upon the request of Torres' counsel. (*Id.* at 31.) In the interview, Torres admitted to molesting V. and G. (Lodgment 3 at 49-65.)

Torres argues that after failing to exclude evidence of his prior sexual offenses, counsel should have asked the court to redact or sanitize the convictions, should have objected to various parts of the testimony of the prior victims, and should have moved to redact prejudicial and inflammatory portions of his interview with police. Torres raised this claim in the petition for review he filed in the California Supreme Court where it was denied without explanation. (Lodgment 12.)

The state appellate court, which issued the last reasoned decision, found Torres' trial counsel made "reasonable and concerted efforts to exclude the challenged evidence." (*Id.*) Particularly, the state appellate court noted trial counsel had renewed his objections to the recorded confession, arguing the tape's probative value was substantially outweighed by the prejudicial effect because the parties had already stipulated that Torres pled guilty to the charges. While the trial court overruled the objection, trial counsel did successfully have portions of the tape redacted. The state appellate court found trial counsel's efforts to be reasonable and not ineffective given trial counsel's partial success in making this objection. This Court agrees.

Pertaining to the admission of the actual convictions themselves, even if Torres's trial counsel did not act reasonably, Torres cannot show prejudice. Under California Evidence Code § 1108, evidence of specific prior sex offenses may be admitted to show the defendant's propensity to commit the current crime. "The evidence is presumed admissible and is to be excluded only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters." *People v. Cordova*, 62 Cal. 4th 104, 132 (2015). A trial court must consider the factors described in *People v. Falsetta,* 21 Cal. 4th 903, 917 (1999), in determining whether to admit the evidence under § 352. These factors include the "nature, relevance, and possible remoteness" of the prior and current acts, and the "similarity to the charged offense." *Falsetta*, 21 Cal. 4th at 917.

The trial court here performed the appropriate review of the evidence and found that the *Falsetta* factors weighed in favor of admitting Torres's prior convictions. (Lodgment 1 at 11.) As the state appellate court noted, the prior convictions were relevant and probative of whether Torres was sexually attracted to young girls and the credibility of the victim, which Torres called into question. (Lodgment 9 at 31-32.) In addition, the facts underlying the prior convictions were strikingly similar to the facts in the current case. (*Id.*) For example, in both cases, the molestations occurred during the early morning hours in the victims' bedroom while a sibling was sleeping nearby, the sibling did not wake up when the molestations occurred, and Torres was alleged, among other things, to have stroked the victim's legs while they were sleeping. (Lodgment 1 at 9-10.) There was no risk of confusing or misleading the jury, the certainty of the commission of the prior convictions was high, and the prior crimes were not particularly remote in time. (Lodgment 1 at 32-35.)

Torres has not explained what portions of V. and G.'s testimony should have been sanitized upon a motion by trial counsel, nor what portions of his interview with McGhee should have been redacted. Instead, Torres makes only general, conclusory allegations. *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994). While Torres could have argued to this Court the prior convictions' probative value was substantially outweighed by their prejudicial effect, he did not. Similarly, where Torres might have argued had his trial counsel moved to so sanitize the prior convictions, trial counsel would have been effective, Torres did not. Torres did not point to any one action or inaction by his trial counsel which was not up to the reasonableness standard articulated by *Strickland*. As such, he has not established that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

Furthermore, even if Torres had shown an instance where trial counsel had acted unreasonably, Torres would still not prevail. Torres has not satisfied the second Strickland prong that he was prejudiced by any error because he has not shown that any

arguments by counsel regarding sanitizing his prior victims' testimony or further redacting his interview with McGhee would have been successful in altering the outcome of the trial. *See Kimmelman v. Morrison*, 477 U.S. 365, 373-74 (1986) (holding that "[w]here defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious"); *Daire v. Lattimore*, 818 F.3d 454, 465-66 (9th Cir. 2016) (stating that, in the context of a failure to file a motion to strike, a petitioner must show the motion would have been successful). Given the strong evidence of guilt provided by the victim's testimony, the testimony of her friends and school officials to whom she disclosed the molestation, and the testimony of law enforcement officials and the forensic interviewer who interviewed the victim, there is no reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* Accordingly, Torres is not entitled to relief as to this claim. *Williams*, 529 U.S. at 412-13; *Yarborough*, 540 U.S. at 4.

### *2. Failure to Move for a Mistrial During Voir Dire*

In ground four, Torres argues trial counsel was ineffective for failing to move for a mistrial after a prospective juror made prejudicial comments about recidivism. (Doc. 1 at 2-24.) During voir dire, a prospective juror, Juror No. 90, told counsel she was a neuroscientist who studied "fear, rage and attraction" and had "special expertise" which would "probably add bias to the jury." (Lodgment 19 at 141.) Juror No. 90 articulated that she would "add extra weight" to her knowledge of sex offender recidivism rates. (*Id.* at 142.) Juror No. 90 was excused for cause, but Torres contends counsel should also have made a motion for a mistrial at this point because the entire jury panel was allegedly tainted by the juror's statements.

Torres raised this claim in his petition for review filed in the California Supreme Court. (Lodgment 12.) The state appellate court, however, provided the last reasoned decision on the issue. In furthering his argument to this extent, Torres cited one California case and one Ninth Circuit case; both of which were found easily

distinguishable from Torres' case. (Lodgment 13 at 41-44.) Additionally, the state appellate court held Torres' "experienced trial counsel" exercised his professional judgment in finding the jurors able to serve as impartial jurors. (*Id*.) Without more, the state appellate court would not "second-guess" this "reasonable decision." (*Id*.) Torres' claim was therefore denied.

Before this Court, Torres again argued that state appellate court decision was not aligned with precedent, specifically *Mach v. Stewart*, 137 F.3d 630 (9th Cir. 1997). There, as here, during voir dire in a child molestation prosecution, a prospective juror made "expert like statements." That juror stated based on her employment with Arizona Department of Child Protective Services, she would not discount the veracity of the victim because she had never been involved in a case where the child-victim had fabricated allegations. The *Mach* court held that "given the nature of [the juror's] statements, the certainty with which they were delivered, the years of experience that led to them, and the number of times they were repeated," the court could "presume at least one juror was tainted." *Id*. at 633. The state appellate court here found the facts in *Mach* clearly distinguishable from those facts in Torres' case. This Court agrees. The jury in Torres' case did not hear any clear and definitive statements regarding Juror No. 90's beliefs or opinions, or the alleged supporting evidence. Without this detail, Juror No. 90's statements were vague and therefore unlikely to have "tainted" any of the prospective jurors, let alone those who participated in deliberations. *Id*.

The Sixth Amendment guarantees "the right to a fair trial by a panel of impartial, 'indifferent' jurors." *Irwin v. Dowd*, 366 U.S. 717, 722 (1961). A fair trial requires that a jury reach a verdict based only on the evidence presented at trial. *Turner v. Louisiana*, 379 U.S. 466, 472 (1965). Torres argues Juror No. 90's statement about recidivism acted as extrajudicial evidence upon which the jury relied. To have avoided this, Torres argues his trial counsel should have moved for a mistrial. Torres also argues "a reasonable[,] competent attorney acting as a zealous advocate would have moved to quash the venire panel . . . ." (Doc. 1 at 23-24.)

The Supreme Court of California has held the discharge of an entire venire is a "remedy that should be reserved for the most serious occasions of demonstrated bias of prejudice." *People v. Medina*, 51 Cal. 3d 870, 889 (1990). Such an occasion arises when the "interrogation and removal of the offending venirepersons would be insufficient protection for the defendant." *Id.* There was not such an extreme occasion in Torres' case. Before the juror made the comments in question, the trial judge told the jurors they would be hearing evidence that Torres had been previously convicted of committing a lewd and lascivious act against a child under 14 years of age. (Lodgment 19 at 98.) Several jurors expressed misgivings about their ability to follow the judge's instructions regarding how to consider Torres's prior convictions. (*Id.* at 98-104.) The judge questioned each of them and explained several times that they would be required to follow the instructions given to them and to evaluate the evidence before them fairly and objectively. (*Id.*) Two jurors were excused for cause following this questioning. (*Id.* at 108.) The next day, defense counsel continued questioning jurors about how Torres's prior convictions would affect them, emphasizing the need for jurors to listen to the evidence, and hold the prosecution to its burden of proof. (*Id.* at 118-25.) The prosecutor also questioned jurors about how Torres's prior convictions would affect their ability to be fair and hold the prosecution to its burden of proving the case beyond a reasonable doubt. (*Id.* 142-51.) Following this questioning, the jurors who expressed significant misgivings about how Torres's prior convictions would affect their deliberations were excused for cause, including Juror No. 90. (*Id.* at 167.).

Given that Torres's prior convictions were going to be admitted at trial, counsel's decision to use voir dire process to both eliminate biased jurors and educate the remaining potential jurors about how they were required to consider Torres's prior convictions was a more reasonable and strategic choice than attempting to disqualify the venire. *Strickland*, 466 U.S. at 697. Moreover, counsel could have reasonably concluded that any motion to dismiss the jury panel would fail given the extremely high standards necessary to warrant such a dismissal. *Medina*, 51 Cal. 3d at 889. Because Torres has not

established any such motion would have been successful, Torres has not established he was prejudiced by trial counsel's declining to so move. *See Kimmelman*, 477 U.S. at 373-74; *Daire*, 818 F.3d at 465-66. Because Torres has not set forth facts showing his trial counsel was in fact constitutionally ineffective, Torres' claim to this extent is **DENIED**.

### D. Cumulative Error

Finally, Torres argues the cumulative impact of the alleged errors warrant the Court's granting habeas relief. This Court has found that none of the claims Torres has presented amounted to constitutional error and none beyond those asserted exist. Because no errors occurred, no cumulative error is possible. *Hayes v. Ayers*, 632 F.3d 500, 523-24 (9th Cir. 2011) (stating that "[b]ecause we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible"). Therefore, Petitioner is not entitled to relief for his cumulative error claim. *Williams*, 529 U.S. at 412-13; *Yarborough*, 540 U.S. at 4.

## VI. CONCLUSION

This Report and Recommendation is submitted to the Honorable Janis L. Sammartino, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c)(1)(c) of the United States District Court for the Southern District of California. For the reasons outlined above, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition for Writ of Habeas Corpus.

Any party may file written objections with the Court and serve a copy on all parties on or before **July 6, 2018**. The document should be captioned "Objections to Report and Recommendation." Any reply to the Objections shall be served and filed on or before **July 20, 2018**. The parties are advised that failure to file objections within the specific time may waive the right to appeal the district court's order. *Ylst*, 951 F.2d at 1157 (9th Cir. 1991).

//

**IT IS SO ORDERED.**

Dated:  June 19, 2018

_____
Hon. Peter C. Lewis
United States Magistrate Judge